JAMES M. JONES, plaintiff in error, *vs.* GEORGE T. ROGERS and SON, defendants in error.

NOTE.—WARNER, C. J., did not preside in this case.

1. Concentration by the agency of the press, or by associations of public opinion to effecuate any laudable intent, as to support the Government or to sustain legally its currency against depreciation, cannot be considered as "duress." A person acting under the influence of public opinion, thus produced, is entitled to no relief in any Court, for acts done by him under the legitimate pressure.

2. But when his debtor, being a member of a vigilance committee created under the recommendation of a large public meeting of the citizens, and who publicly announced " that they will hold all persons as enemies of this Confederacy who shall by any means depreciate the Confederate currency, or shall refuse to receive it in payment of debts, and will use their best endeavors to bring all such persons to condign punishment by legal means, if the laws provide such punishment, but if not, with or *without law*"—reports the creditor to the vigilance committee for having refused to receive from him, in payment of a debt due before the war, such currency, and *thereupon* the creditor is summoned to appear before the committee to answer for his conduct, and in the meeting is denounced by a member of the committee as a traitor, and publicly on the streets by another, the receipt of the Confederate currency under such circumstances was involuntary ; it was under constraint, " duress," and fear produced by the threat of bringing him to condign punishment *with or without law ;* fears for his personal safety endangered by his denunciation as a traitor.

3. Equity in such case will grant relief.

Equity. Duress. Tried before Judge COLE, Bibb Superior Court, January Adjourned Term, 1867.

Complainant avers that on the 20th of August, 1862, George T. Rogers and Charles H. Rogers (using the firm name of George T. Rogers & Son) made and delivered to him their promissory note, due one day after its date, for $1,354.23, which indebtedness arose as follows : Complainant in 1857 loaned James G. Rogers, son of said George T., and then a merchant in Savannah, $4,000.00, on the endorsement of said George T. Rogers & Son, and on the —— day of ——, 1859, said firm assumed said indebtedness and took control of the notes or drafts constituting said previous in-

debtedness, and gave their own notes for the same; and their said note of $1,354.23 was given in renewal of the balance of their said note given in 1859. On or about the —— day of September, 1863, said firm offered to pay off said promissory note in Confederate Treasury notes, (at par,) which were then greatly depreciated. Complainant had for years had his money loaned out for interest as an investment, and having no occupation or pursuit in which he could advantageously use said Confederate Treasury notes, he refused to receive the same in payment of said note. Thereupon, said firm threatened to report complainant to "the Vigilance Committee," then organized and appointed by a public meeting of the citizens of Macon, which committee consisted of Thaddeus G. Holt, Chairman, Preston E. Bowdre, Charles Collins, Thomas A. Harris, William B. Johnston, William T. Mix, Robert B. Barfield, Jackson DeLoache, John J. Gresham, said George T. Rogers, and perhaps others, who were organized and charged to look after and regulate and punish offending citizens who refused to take Confederate Treasury notes in payment of debts due to them before the war then existing; that a resolution of a meeting of the citizens of Macon, passed 17th Feb., 1863, was the foundation of that committee's authority, said committee having been appointed by the City Council of Macon in conformity thereto; and that said resolutions embraced the scope of the authority assumed by said committee, which acted in conformity thereto.

The resolutions alluded to are here set out, and are the same hereinafter set forth in the evidence as the proceedings of said meeting.

At the time of such refusal, and as an additional reason therefor, Vicksburg and Port Hudson had fallen, by which the Southern Confederacy had become irrevocably severed by Federal occupancy of the Mississippi River, and the Confederate Army of Virginia had been defeated at Gettysburg, and the Western Army of the Confederate States had fallen back before superior forces from Tullahoma; and complainant really believed the subjugation of the Confederate States was

only a question of time, and Confederate Treasury notes, in comparison with specie, was then as fourteen to one discount, and complainant then believed they would be worthless; and again, said firm were then actively engaged in merchandizing for Confederate money, and could more safely employ such capital than could complainant; and in 1859 complainant had sued said firm for this debt, and had withdrawn the suit, (because said George T. represented that his credit would be thereby injured,) and made the arrangement already stated.

Said firm reported said refusal to said Chairman of said Vigilance Committee, who notified complainant to receive said funds from said firm, and threatened to assemble the Committee and call complainant before it if he did not. Complainant still refused, and was cited by said Chairman to appear before said Committee on the 10th September, 1863; and in view of the threats of members of said Committee to publish complainant as a traitor, and of the danger to his person and property consequent upon continued refusal, and upon the advice of one of said Committee, James H. R. Washington, (who fully justified complainant in his legal and moral right to continue such refusal,) to yield up his rights and accept said Treasury notes at par, complainant authorized said Washington to represent him before said Committee and do whatever he thought best, and so to inform said Committee. Washington attended the meeting, (where was also George T. Rogers as a member,) and in view of the threatening attitude of a majority, and the danger of disturbance to complainant in the community, Washington withdrew complainant's refusal, and promised that he would take the said Treasury notes at par for said debt; and thereupon complainant gave up his note and took said currency therefor at par. Complainant did not invest said funds in property, but with other funds it was converted into State Treasury notes, which have been repudiated, (complainant having of them at the date of repudiation and now $1,493, and $550 loaned on call in March, 1865, all of which is now worthless.

Complainant waives all answer to the bill, except to these interrogatories:

INTERROGATORY 1ST. Did not said Jones, on or about 20th August, 1862, receive the promissory note of Rogers & Son, due one day after date, for $1,354.23, or about that sum? and what was amount of same, its date, and when due?

INT. 2D. Was not this note given in renewal of the balance due on a note or notes he held on Rogers & Son for a settlement of about $10,000, or other large sum, in 1859, by which said Rogers & Son became possessed of and the owners of the note or draft for that sum, previously held by said Jones made or drawn by James G. Rogers, and endorsed by said George T. Rogers & Son, and on which said Jones forebore suit, and made said exchange? what was the amount of said draft, its date, and when due; and who were the drawer, endorser, and acceptor?

INT. 3D. Did not said Rogers & Son, in September, 1863, offer to pay said promissory note to said James M. Jones, alluded to in interrogatory first, in Confederate Treasury notes at par, and did he not refuse to receive them in payment, and on such refusal did not Rogers & Son notify the Chairman of the Vigilance Committee as aforesaid of the fact, and did said Rogers & Son afterwards, and about that time, pay off said note in said Confederate Treasury notes at par to said Jones? when was the payment made, and how much in Confederate Treasury notes was given in payment of the same, and when?

Complainant avers that he was thus forced into delivering up said note, and prays that he now have a judgment for the amount due on the same, and for such other and further relief as is equitable in the premises.

Both defendants answered that complainant loaned to James G. Rogers $4,000.00 on or about the 14th July, 1857; James G. Rogers drew a draft on Way & Taylor, of Savannah, for $4,500.00, July 14th, 1857, payable twelve months after date, to order of George T. Rogers & Son, which draft was endorsed by George T. Rogers & Son, who got nothing therefor, but endorsed for accommodation only, and accepted

by Way & Taylor, and delivered to complainant in consideration of said loan.

On 8th July, 1859, the said draft was taken up, and in *lieu* of it said James G. Rogers made his note for $5,080.07, payable 17th July, 1859, to order of said Rogers & Son, and endorsed by them and said Way & Taylor.   When and after this last note was due, George T. Rogers & Son paid all of it except about the amount for which the note of $1,354.23 aforesaid was given, and took up the note for $5,080,07. Complainant states the date of the last note correctly ; defendant did propose to pay this note in Confederate Treasury notes; complainant did refuse to receive them.   George T. says he did not threaten to report him to the Vigilance Committee, or make any other threat ; said note for $5,080.07 was in hands of Stubbs & Hill for suit, but suit was withdrawn, under what circumstances not recollected.

GEORGE T. also answers that he did report said refusal to the Chairman of said Committee, but does not know what said Chairman did or said on the subject to complainant ; that afterwards, sometime in September, 1863, they did pay off said note at its face, principal and interest, in Confederate States Treasury notes.

CHARLES H. ROGERS also adopts the statements as to the time when and the currency in which said note was paid off, and states that suit was withdrawn upon a proposition of complainant, and admits that something was said about suit injuring credit of the defendants ; he answers that more than once in May or June, 1863, he offered to pay said note in Confederate Treasury notes, (before Vicksburg fell,) and also offered to pay him in cotton when it was about 45 cents per pound ; and that complainant refused these offers.   He says nothing as to reporting to Vigilance Committee or threats, and sets up that that the notes *ab origine* were tainted with usury.   They claimed that the note was paid.

Upon the trial, after the bill and answers had been read, the parties introduced the following evidence:

11

EVIDENCE OF COMPLAINANT.

THADDEUS G. HOLT testified that he was Chairman of Committee appointed by the City Council under the resolutions of the meeting of the citizens of Macon, of February, 1863. About 1st September, 1863, George T. Rogers notified him, as such Chairman, that complainant had refused Confederate Treasury notes in payment of a debt due to complainant by George T. Rogers & Son. Witness shortly thereafter met complainant in the street and told him of said complaint, advised him to take the money, but complainant refused. Witness told him if he persisted in refusing witness would call the Committee together and lay the case before it.

Complainant persisted. Witness called the Committee to meet September 3d, but at request of complainant, and because he was indisposed, the meeting was postponed to 5th of that month.

On the 5th, part of the Committee assembled, to wit: (as well as recollected) T. G. Holt, J. B. Ross, J. J. Gresham, W. B. Johnston, Charles Collins, P. E. Bowdre, T. A. Harris, J. DeLoache, George T. Rogers, G. W. Price, A. Mix, Robert B. Barfield, and J. H. R. Washington.

Complainant was not present, but J. H. R. Washington claimed that he was authorized to represent him, and did so. Complainant's said refusal was stated to the Committee, and after discussion, but before final action, Washington stated that complainant would take the money.

Witness does not recollect what was said in the discussion; thinks Charles Collins and T. A. Harris expressed themselves most strongly against complainant's said conduct.

On cross-examination, witness said he did not understand that the said Committee had or assumed to have power to punish for such refusals, the object being to make citizens take said Treasury notes by bringing to bear public opinion on them; that as such Chairman he never undertook to carry out the resolutions of February, 1863, except by force of public opinion as aforesaid; that he knew of no threats being made by any of the Committee.

Jones *vs.* Rogers & Son.

ROBERT B. BARFIELD testified that he was present as a member of said Committee on said occasion ; complainant was absent, but represented by said Washington, one of the Committee; the matter was discussed; some of the Committee were violent in denunciation of complainant's said course ; he did not recollect all that was said, but thinks that Charles Collins, then or shortly before, said that if complainant persisted in his said refusal, he ought to be published as a traitor, or words to that effect ; after the discussion had progressed, Washington, apprehensive that a majority of the Committee would be opposed to complainant's course, notified the Committee that complainant would receive said currency.

Before the meeting, witness advised complainant that he did not think it would be safe for complainant to persist in his said refusal, and Washington assured complainant after the meeting had adjourned that he had told the Committee that he, complainant, would take the currency, and that, in his opinion, it was not safe for complainant to refuse it.

Witness is satisfied from what took place with the Committee, afterward and during the same meeting, in the case of Dessau, that the Committee would have been against complainant had not Washington acted as aforesaid.

In Dessau's case, (for such a refusal) and for refusal to meet the Committee, a Sub-Committee of three was appointed to wait on Dessau, of which Charles Collins was Chairman; Collins afterwards said Dessau would take the money, but whether he did take it, witness knew not.

On cross-examination, he stated that J. B. Ross, A. Mix, J. DeLoache, W. B. Johnston, G. W. Price, were moderate men. Witness and Washington were there (opposing the action) as friends of complainant.

ALBERT MIX testified that he was at said meeting of the Committee ; strong feeling was exhibited by the majority against complainant ; some violently denounced his conduct ; thinks Charles Collins one of the most violent, though he could not recollect what was said.

GABRIEL B. ROBERTS testified that from the 1st to the 15th September, 1863, said currency was at the rate of fifteen

for one in gold in Macon. He further stated that he was a citizen of Macon and well acquainted with his fellow-citizens, and was thereupon asked " whether, from such knowledge, he did or did not believe that at that time, September 15th, 1863, complainant could with safety to himself have publicly refused to take Confederate Treasury notes for said debts."

Upon objection made, the Court refused to allow said question answered.

Complainant testified in his own behalf that he loaned James G. Rogers $4,000.00 for twelve months, and took his draft therefor on Way & Taylor, of Savannah, accepted by them and endorsed by defendants for $4,500.00, that being the customary rate at which the banks were discounting such drafts ; in July, 1858, the draft was renewed in same way and at same rate for six months, the interest being added in ; when this was due, or shortly afterward, it was again renewed for six months at same rate of discount, and changed into a note on James G. Rogers, endorsed by Way & Taylor and George T. Rogers & Son, for $5,080.07, on 17th February, 1859 ; when this note was due, complainant got Hill & Stubbs to sue on it, and took the writ to George T. Rogers & Son to get acknowledgment of service. They asked not to be sued ; said suit would injure their credit, and proposed to take up the note and give their own for same amount, if further time were given. Complainant thereupon divided the debt into installments, due at different times, with seven per cent. interest, and took the notes of Rogers & Son, without security, in payment of said note. On 20th Aug., 1862, said last notes had been paid off in money and notes, except a balance of $1,354.23, and for this they gave a note in renewal.

No offer was made to pay this last note till in July or August, 1863, after the fall of Vicksburg and Port Hudson, the falling back of General Bragg to Chattanooga, and the battle of Gettysburg.

Up to these events, witness had taken $4,000 or $5,000 in currency for debts due before the war, and when the currency was of little use to him for re-investment, and he refused to

Jones *vs.* Rogers & Son.

take any more; so told Rogers & Son and his reasons for refusing, to-wit: that his capital had been invested in loans before the war, and he had lost as much as he could afford to lose; Rogers asked him to take the money and invest it in cotton; witness replied that he was not trading or speculating, nor had he been, but as he, Rogers, was, he ought to invest the money and keep it till he could pay something valuable.   About September, 1863, Rogers persisting in his offers, complainant peremptorily refused the currency on Saturday, August 29th, 1863.

On Monday following, complainant was called on by T. G. Holt, chairman of said committee, on the street, and they commenced a discussion about said refusal; complainant replied that George T. Rogers had been complaining of him; Holt admitted that he had, and insisted that complainant should take the currency from Rogers; complainant attempted to reason with him, rehearsed what he (complainant) had said to Rogers, and said that he (Holt) and the other members of the committee, who had their capital invested in railroad and factory stocks, and lands and other property, would not exchange their investments for such currency (then so much depreciated) at par; complainant reiterated his refusal, and Holt said he would call the committee together; Holt, at complainant's request, gave him the names of the committee-men; a day or two afterwards, complainant was formally notified to appear before said committee, by a city policeman, on Thursday of that week; witness, on account of sickness, sent a note to said chairman, asking a postponement of the case till Saturday, and received the following reply:—

*September 3d,* 1863.

Mr. J. M. Jones:

*Dear Sir:*—Your note is received.  In reply, I have no power, at this late moment, to postpone the meeting of the committee.   The committee may postpone the investigation, on the reception of your note to me, giving notice of your indisposition.        Very respectfully,

T. G. Holt.

The investigation was postponed till Saturday. Before that meeting of the committee, complainant conversed with one of the committee, P. E. Bowdre, who said he thought it was treason to refuse to take the currency, but as complainant thought differently, he would not say that of complainant. Some hour or two before the meeting, complainant met Charles Collins, one of the committee, on the street. Collins told him to take that money from Rogers; complainant replied that he would not, that it was an outrage. Collins said if he did not take it, he would be published to the world as a traitor. Complainant then went to the bank and saw J. H. R. Washington, one of the committee, and told him to represent the case before the committee, and entrusted the whole matter to him, to do what he thought best under the circumstances.    Washington agreed to attend the meeting and represent complainant.

After the meeting, Washington reported to complainant that he had agreed before the committee, that the money would be received, and that while he regarded it as a great outrage upon complainant's rights to be compelled to do so, he did not think him safe in refusing. R. B. Barfield, another of the committee, who had attended the meeting as complainant's friend, gave the same advice.    Thereupon complainant delivered up said note and took Confederate treasury notes at par therefor. He put said treasury notes with his other money, and never invested it further than endeavoring to exchange his treasury notes for State treasury notes of the State of Georgia, payable in Confederate States treasury notes, and receivable for State taxes, and had them at the end of the war, and now has of such State treasury notes $1,493, and in Confederate money $68, and loaned on call in March, 1865, $500, and valued at the time at about sixty for one in gold. Complainant took said currency from Rogers & Son because he did not consider it safe for him to refuse to do so longer, under the circumstances.

Jones *vs.* Rogers & Son.

The following appeared in the *Georgia Journal and Messenger* of February 25th, 1863, and was read in evidence :

### PUBLIC MEETING IN MACON.

*Macon, February* 17*th,* 1863.

In pursuance of a call published in the *Daily Telegraph,* a large number of the citizens of Macon and the surrounding country, assembled this day in the City Hall.

The meeting was organized by calling the Hon. T. G. Holt to the chair and appointing W. D. Williams Secretary. The Chairman, on taking his seat, made known the object of the meeting, and announced that it was ready for business.    On motion of Col. Whittle, a committee of five was appointed by the Chair, to-wit; Messrs. L. N. Whittle, Nathan Bass, J. J. Gresham, W. B. Johnston and A. Lockett, to consider and report business for the action of the meeting.

Isaac Scott, Esq., being present, rose and stated that he had been informed by a friend, that certain transactions in which he was a party, were in part the occasion of the call of this meeting ; and if such were the case, he desired permission to make some remarks.    On motion of Col. W. B. Parker, this permission was granted, and Mr. Scott accordingly occupied the attention of the meeting for a short time with some statements and explanations in regard to said transactions.    The committee having retired, returned and reported the following preamble and resolutions, which, on motion of Col. W. K. DeGraffenreid, were unanimously adopted :

"Although, happily for us, we ourselves are remote from the actual din of battle and clash of arms, and are allowed to enjoy in ease and security, the comforts of our homes and firesides, still we recognize the fact that we of Georgia, together with our sister States of the Confederacy, are in the midst of revolution and war, and that these blessings are allowed us in consequence of the energy and gallantry of our young men, of our brothers, sons and friends, who have rushed to the field and are now confronting our enemies, offering themselves willing sacrifices for us, for our property,

and for their families whom they have left behind and in our keeping.

"We are engaged in a war, whether considered in view of the numbers engaged on either side or the mighty results which must invariably follow to us, involving liberty and independence on the one hand or utter subjugation and ruin on the other, of such magnitude as the world never before saw, and this with one of the most powerful nations of the earth, outnumbering us near three to one, requiring on our part not only unity of purpose but concert of action, and the active development of every power and aid to assist and sustain our young government and brave troops in the mighty and unequal contest in which we are engaged; with this union and concert, smiled on as we feel we have been heretofore by a kind and gracious Providence, we must succeed, unless we shall be shorn of our strength by enemies lurking in our own midst, under the guise of friends.

"To wage this war does now require and will require to keep troops almost innumerable in the field, to supply them with clothes, sustenance and transportation, to manufacture and supply immense quantities of arms and all the munitions of war, to provide for and take care of the wives and children whom our volunteers have left in our charge, while they are away battling, and if need be, dying in our defence; these and each and all of them, will require large sums of money to procure and supply, and without which the struggle must be given over; indeed, without money for the future, as well as now, we are already vanquished.

"Our young government, not yet two years old, being cut off from all commercial intercourse with the world, hemmed in by the powerful navy of the enemy, is forced to rely on her own resources for money as well as for all other requisites to carry on this war for our independence, and although containing within itself all the elements of wealth sufficient even for this great emergency which is upon her, she is forced while the blockade of her ports shall continue, to resort to her credit until she shall be able to send abroad and dispose of the rich commodities with which almost every

farm in the land is filled, so that for the time, this credit as used by our government, the Confederate currency is to us, all in all.

"Destroy this credit, break down this currency, and our armies must of necessity at once give up the fight and come home, and we with them occupy the position our enemies in no other way have been or will be able to force upon us, that of serfs and slaves to the bigots of New England and their allies and friends.

" He who would thus work our ruin, would not hesitate to lead our troops into the ambush of the enemy, or by any other means in his power, short of taking the field as an open enemy, work our ruin.

" Therefore,

" *Resolved*, That we will hold all persons as enemies of this Confederacy, who shall by any means, depreciate the Confederate currency or shall refuse to receive it in payment of debts, and will use our best endeavors to bring all such to condign punishment by legal means, if the laws provide such punishment, but if not—to punishment with or without law.

" *Resolved*, That inasmuch as the Confederate Government has made its treasury notes a legal tender in payment for supplies for the army taken from the citizens by impressment, by compelling such citizens to receive them in payment for such supplies, and also in payment of its troops, we deem it both the duty and interest of the Government, as well with the view of sustaining its credit, as an act of impartial justice to all its citizens, to make such notes, by legislative enactment, a legal tender in payment of all debts.

" *Resolved*, That the proceedings of this meeting be sent to our Senators and Representatives, to the end that they may bring the subject before Congress, and either pass a law making the Confederate currency a legal tender, or a law inflicting severe punishment on all who shall endeavor to depreciate or lower its value.

" *Resolved*, That the Mayor and Council of the city of Macon are requested to appoint a Vigilance Committee, to be composed of twenty-five of our best and most substantial

Jones *vs.* Rogers & Son.

citizens, who shall be clothed with all the power of the city police, and whose duty it shall especially be to collect any and all facts they can, bearing on this subject, and bring the offenders to punishment.

"*Resolved,* That the Committee who shall be appointed by the City Council, collect as far as they can, the names of all persons in the city, who have refused to receive the currency in payment of debts due them, that they may be brought to the notice of the public and to punishment; (on motion of C. J. Harris) that any attempt tending directly or indirectly to depreciate the currency of the country, is unpatriotic.

"*Resolved therefore,* That during the continuance of the war, the attorneys of this city be recommended to reject all claims for suits, where the party plaintiff refuses to accept Confederate money in payment of the same."

On motion of J. Rutherford, Esq., the proceedings of this meeting were ordered to be published in the city papers, and all journals favorable to the objects of the meeting, requested to copy. The meeting then, on motion, adjourned.

T. G. HOLT, <em>Chairman.</em>

W. D. WILLIAMS, *Secretary.*

The following Committee was appointed by the City Council, in conformity with the above proceedings :

T. G. Holt, J. B. Ross, J. J. Gresham, Wm. B. Johnston, Charles Collins, J. W. Fears, G. M. Logan, S. T. Coleman, P. E. Bowdre, Thomas A. Harris, J. T. Boifeuillet, David Flanders, J. DeLoache, J. A. Ralston, E. L. Strohecker, Nathan Bass, G. T. Rogers, C. C. Sims, W. T. Lightfoot, Robert B. Barfield, George W. Price, W. Massenburg, A. Mix, J. H. R. Washington, Dr. M. S. Thomson.

EVIDENCE FOR DEFENDANTS.

P. E. BOWDRE testified that he was one of said committee; was present when Jones' case was acted upon, and never said there or elsewhere, that any one that refused to take Confederate money was a traitor.

Cross-examined, he said he had no recollection of ever

having made such statement; if he did, he must have been crazy. He said the object was to sustain the currency by bringing public opinion to bear in its favor.

GEORGE T. ROGERS testified that in the transactions with Jones, he was only accommodation endorser for his son, James G. Rogers, and was the same on other debts to a considerable amount; that afterwards James G. Rogers turned over to him a considerable amount of notes, accounts and stock in the Canton Copper-Mining Company, from which he had never realized anything; the stock of the Mining Company, was sold to pay the debts of the Company, and the assets so turned over are worthless; he never threatened complainant in any way for refusing to take the currency, or to make him take it.

CHARLES H. ROGERS testified that in May or June, 1863, he offered to pay Jones said debt in Confederate currency and also in cotton, which Jones refused to take; his recollection is that it was before the fall of Vicksburg.

Cross-examined, he said that up to January, 1863, he was Commissary Quartermaster in the Georgia Battalion in Virginia, and after that, was connected with the Commissary department of Macon under Captain Cunningham; was not in the army speculating; on one occasion, while in Richmond, Virginia, he bought a lot of tobacco and shipped it to Georgia for his father, in execution of an order from his father; never threatened Jones in any way for refusing to take the currency, nor to make him take it.

J. J. GRESHAM testified he was present when the matter of Jones' refusal was discussed; thinks it was at a public meeting; he did not take part in the discussion, and never acted as a member of the Vigilance Committee, and did not hear Jones threatened with any violence; the civil courts were then in full operation, but little business was done besides cases of *habeas corpus.*

Cross-examined, said he might be mistaken in saying the meeting was a public one instead of a meeting of the Committee.

WASHINGTON POE testified that the courts were open and

in operation in 1863, and ready to give protection to citizens in their rights of person and property.

C. B. COLE, (the Judge,) testified the first case of action against persons for refusing to take Confederate money, was that of Isaac Scott; it gave rise to the meeting in February, 1863 ; Scott had refused to take the currency, and persisted in his refusal after the meeting, and never did take it ; but shortly afterwards, in defiance of public sentiment on the subject, Scott sold the notes of the Carharts at public sale ; this he did contrary to the advice of witness and Colonel De-Graffenreid, who were his legal advisers; the sale was, as Scott stated, in order that Carhart could not file a bill asking the courts to compel him to take the currency; notwithstanding such refusal, no steps were taken to make Scott take the currency, by the Committee nor any one else, and no violence was ever done in consequence of Scott's refusal. Witness, about the same time, as an individual and as attorney for others, refused to take the currency and was not disturbed in person nor threatened with violence of any sort; he was not reported to the Committee, so far as he knew.

It was admitted that J. T. Nisbet, who was absent, would swear that, in 1863, he refused several times to take Confederate notes for absent clients, and that no injury was done him, nor any threats of injury to him made in consequence thereof, and this was considered as evidence.

T. G. HOLT (recalled by complainant), stated that Gresham was mistaken in supposing Jones' case was acted on at a public meeting of the citizens : it was at a meeting of the Committee.

The Court charged the jury that "if they believed, from the evidence, that complainant received from defendants the Confederate money in payment of said note, voluntarily and without any force or violence or threats from the defendants, or from any agency they had put in motion, they should find for the defendants ; that if it was the purpose and intent of the Vigilance Committee to induce complainant to take the Confederate money from the defendants at par, by bringing public opinion to bear on him, and complainant, to avoid

Jones *vs.* Rogers & Son.

this, agreed to take and did take it in payment of his notes, the payment was a good one; but if there was any force or intimidation used by defendants, or by any agency of the defendants, that would take away or destroy the free action of a man of ordinary firmness, the payment was not a good one; that they were the sole judges of the evidence and the weight they should give it, and should they be, by the evidence, satisfied that complainant was induced to take said currency by threats of violence, or by such menaces as would deprive a reasonably firm man of free voluntary action, then they should find for complainant; but if complainant took the currency in deference to public opinion, and without any fear of violence to his person or property, then the payment was a good one, and they should find for defendants.

The Court was requested to charge: " If the jury believe from the testimony, that James H. R. Washington and Robert B. Barfield, after meeting and conferring with the Vigilance Committee, advised the complainant that they did not consider it safe for him to refuse to take the Confederate money in payment, of defendants, that then the complainant had a right to act on such information, provided the jury should believe that said Washington and Barfield should have been men of ordinary firmness and intelligence."

The Court gave the request, with this qualification: " If the unsafety consisted merely in bringing public opinion to bear upon the complainant, and he acted voluntarily and in deference to public opinion, then he did not act under such duress as would avoid the payment made to him."

The Court further charged, that should the jury believe from the evidence and the law as given them in charge, that complainant was entitled to recover, they should deduct from the amount the value of the Confederate money he took at the time he took it, and if from the evidence they believed complainant had received from defendants usurious interest, they should also deduct the amount of such usurious interest.

The verdict was for the defendants, taxing them with half of the costs.

There is no assignment of errors in the record.

The bill of exceptions states that during the trial exceptions were taken on the following grounds :

Because the Court refused to allow an answer to said question propounded to Gabriel B. Roberts, as to his opinion of the danger incurred by refusing said currency.

Because the Court charged as aforesaid, and refused to charge as requested.

. B. HILL for plaintiff in error.

LANIER & ANDERSON for defendants in error.

HARRIS, J.

1. If the complainant (Jones) in receiving the depreciated Confederate Treasury notes, in September, 1863, in payment of the note of the defendant, due before the war began, did so through the influence of public opinion brought to bear on his action by an association organized to persuade and impress men with a sense of public duty, or through the instrumentality of the press, appealing to the patriotic feeling of the citizen, in such case he could not and ought not to have relief in a Court.   Such an act would be deemed voluntary. Conscious, as men of intelligence are, that individual example and moral power can, at most, accomplish but little in producing widely beneficial results, they almost instinctively resort to combinations of mind, wealth, character and position—aggregated, the scope and power of the association becomes the sum of the elements thus united—and knowing them, we are thereby furnished with a correct measure of the power it is capable of exerting.   Acting within a legitimate sphere, exerted in the cause of education, charity, humanity— in the furtherance of a common public interest or policy—our experience demonstrates many beneficent results which have been accomplished by their agency.

2. But when such associations are formed, though with generous and patriotic ends in view, when the means they employ are unauthorized by law and coercive in their nature, when they combine avowedly, not by personal sacrifice and

Jones *vs.* Rogers & Son.

individual example of each, or by persuasive appeals to the hearts and interests of the people to co-operate with them, but to *force* men by the awe and fear of personal punishment to yield to and comply with their will, then it is that such associations exert a baleful influence over the community in which they exist, depriving men of their freedom, and thus subverting law.

The case of complainant makes it necessary that we should seek through the testimony in the record to ascertain whether the act which he alleges to have been involuntary, is or not ascribable to the influence of an organization of the last kind above described, over his conduct.

Some case or cases having occurred early in the year 1863 of a refusal by a citizen of Macon to receive Confederate Treasury notes in payment of debts due to him, a call for a public meeting was made in the newspapers. A large number of the most respectable citizens of the place assembled, appointed a chairman and a committee, to report the sense of the meeting. The burthen of the report was an impassioned exposition of the momentous importance of sustaining the credit of the Southern Confederacy as vital to the success of its cause, and the report was accompanied by several resolutions, which were unanimously agreed to.

The report denounced as *enemies to the Confederacy* all persons who refused to receive its Treasury notes in payment of debts, and one of the resolutions pledged the meeting to the use of their best endeavors to bring all such men to condign punishment by legal means, if the laws provide such punishment. To this extent the action of that public meeting might have gone without transcending the limits heretofore stated, for it had an unquestionable right to unite in giving efficiency to existing laws.

There were, however, as must have been known to several distinguished legal gentlemen, who appear to have mingled their counsels with the other persons constituting the meeting, no laws of the Confederate or State governments which made the refusal to receive Confederate Treasury notes a *crime,* subjecting a person offending to *any punishment what-*

Jones *vs.* Rogers & Son.

*ever*, none which branded him with the epithet of enemy or traitor. So far, then, as they thus engaged, there was nothing illegal, and with all the industry they might use, they could not assist in bringing any one to punishment by law, as there were no such laws to be violated. It could have served at best for only a scare-crow. But the meeting did not stop with that pledge, they went a step beyond—they boldly crossed the line which separates legality and illegality, persuasion and compulsion, not ignorantly nor unintentionally, but openly, knowingly and defiantly—they resolved *unanimously* that if the laws did not provide punishment, (for those who refused to receive Confederate Treasury notes,) *they would bring them to punishment without law*. Is there no menace, no threat in this? Is there not much more?

To give effect to the combined will of this meeting, it urged the City Council of Macon to appoint a Vigilance Committee of its best and most substantial citizens, who should be clothed with all the powers of the city police, and whose duty it should be to collect all facts they can bearing *on the subject*, and to bring *offenders to punishment*. After ordering the publication of its proceedings in the city papers, it disperses. The City Council take up the subject—it appoints the Vigilance Committee, and places its police at the service of the Committee. The spirit and purposes of the public meeting are transferred to the Vigilance Committee, which was created to carry into effect "the law" prescribed by the public meeting—the last is but the incarnation of the first. The public meeting had, so far as Macon was concerned, added by its legislation a new section to the Penal Code—it had created a *new* crime—its sanction was punishment, but indefinite as to kind or duration; we cannot gather from what they resolved whether it was fine, imprisonment, exile or death—this seems to have been left to the discretion of the Committee.

When we contemplate with some degree of minuteness the constitution of this body, we realize the establishment of an Inquisition of fearful proportions and powers, where each member is employed industriously in collecting the names of

all offenders against "the new law," all facts bearing on the subject. Membership implies an engagement to watch, enquire diligently, to be active and on the alert, to arrest and bring offenders *to punishment*. In fine, the duties imposed and undertaken are those of a police and espionage over the lawful and general business transactions of the city of Macon. This Committee is to exist during the war; it is invested with judicial and executive functions. It arrests the offender, or causes it to be done by the city police; it accuses; it prescribes its own sessions, its modes of procedure, its rules for admission of testimony, the quantity and quality necessary to determine guilt; it judges; it tries; it executes its own sentences. What element is wanting to make a body armed with or arrogating to itself such powers and functions, the most frightful of absolute despotisms?

It had its origin in the best impulses of patriotic hearts—of men who sought to accomplish what they deemed a great public good. But nothing was capable of greater perversion or could produce more injustice than the enforcement of its own requirement of compelling the receipt of Confederate Treasury notes at par in payment of all debts. It was not so intended, but it led to shameless wrong; it became, in fact, an invitation to those who did not feel the restraint of moral principle or conscience to put themselves out of debt at little cost.

Can it be wondered at that debtors will avail themselves of such opportunities, when supported by the weight of large and respectable bodies of men, who stand pledged to punish all persons who do not comply with *their will?* The men are rare who have physical and moral courage enough, though conscious of their rights, to defy such coercion; most men fear to encounter a hazard which is undefined, a punishment which cannot be computed. But we will proceed and see whether the compulsory power of this Vigilance Committee was brought to bear on Jones, and how:

The defendant, a member of this Committee, was indebted by note made before the war to Jones. When the Confederate currency had greatly depreciated, and stood relatively

12

as fifteen of Confederate notes to one dollar in gold, he proposes to pay his debt in those notes at par.   Jones refused. Rogers forthwith reported him to the chairman of the Committee, who convened it at an early day, and caused Jones to be summoned by a *police* officer to appear before it.   Jones got suddenly indisposed, and begged a postponement of the meeting—the meeting assembled and adjourned over for a short period.   In the interval, about an hour before the Committee were to assemble, Jones met with Mr. Charles Collins, a member of the Committee, who told Jones to take the money, and "that if he did not, he would be published to the world as a traitor."   Jones, instead of attending the meeting, went and saw Mr. Washington, another member of the Committee, and put into his hands, and that of Mr. Barfield, also a member, the matter.   The Committee convened.   "There was very strong feeling exhibited in the meeting against Jones for refusing to take the money;" "some of the Committee were violent in their denunciations;" "thinks Charles Collins was one of the most violent;" "thinks Charles Collins said then, or shortly before that, if the complainant would not give in and take the currency, he ought to be published as a traitor, or words to that effect."

Seeing the temper of the meeting, and being of the opinion that a majority were adverse to Jones, Washington and Barfield agree that Jones shall receive the currency, saying to him when reporting what they had yielded to, that they *deemed it a great outrage to his rights,* but that they thought that it would not be *safe* for him to refuse.   Upon this he takes the Confederate Treasury notes and gives up to Rogers his note.

Without an abuse of language, can it be said that he did this voluntarily ?

Interpreting from common sense the conduct of Jones, can any believe that he was sick when asking the meeting to be postponed—why not attend the adjourned meeting ?   Who does not perceive in these facts the influence of fear, especially when his interview with Mr. Collins, just before the meeting

Jones *vs.* Rogers & Son.

of the Committee, is kept in remembrance? That fear was increased by the reports by Washington and Barfield—they thought and said to him that it would not be *safe* for him to refuse to receive the currency. Everything from first to last was minatory, and their opinions were rational, were founded upon what had occurred. Punishment of some kind for refusal was threatened by the resolutions—Jones had been notified to appear before the Committee—a Committee-man had said to him that if he did not take the money he would be published to the world as a traitor. Would it not have been punishment? Is it nothing to be pilloried in a newspaper, to be held up to scorn, to odium? Would not such a publication (libelous though in law it would have been, and indictable,) have been an invitation to the public to join in the hue and cry of denunciation against him? Would it not, moreover, looking to the time when threatened, most probably have endangered his personal security? The city was filled with Confederate soldiers on furlough, or convalescent, or on post duty, and nothing could have been better conceived to have aroused their passions against Jones than to have denounced him through the newspapers as a traitor to the cause in which these soldiers were devoting their lives.

3. This case presents such clear and impressive facts, all converging to a focus, that we cannot avoid their logical force. They demonstrate that duress by threats and menaces of punishment were exerted knowingly and intentionally to compel Jones to surrender his will to the will of the public meeting and Vigilance Committee, and that under the influence of just and reasonable fears inspired by such action upon him, he involuntarily complied with what he deemed an outrage upon his rights.

We notice in the testimony that the highly-esteemed chairman of the public meeting and Vigilance Committee was permitted to give his understanding of the purposes and power of the Committee. This seems to us to have been clearly inadmissible. The preamble and resolutions of the public meeting do not seem to us to be ambiguous; on the contrary they are very explicit, and interpret themselves; be-

sides they are in writing, and necessarily are the best expositors of the sense of those who agreed to them.

Again, we perceive that several witnesses were examined to prove that they had refused to receive Confederate Treasury notes, and that they had not been reported to and arraigned before the Vigilance Committee. Such testimony was impertinent to the matter under investigation, and should have been excluded—the enquiry was, whether duress by force or threats had been used to coerce Jones to receive *contrary to his will* Confederate Treasury notes at par in payment of the note of Rogers?

We send the case back, that upon the new trial the charge of the Judge may distinctly submit to the jury the views herein stated.