KING *et al. v.* LEWIS.

No. 12759. September 13, 1939.

*G. Y. Harrell* and *E. R. King,* for plaintiffs in error.

Reid, Chief Justice. Merritt Lewis, a negro farmer, while appearing before a Quitman County grand jury, made statements that J. C. Gay, sheriff of the county, had been stealing money, and that for forty dollars he had released a defendant in a pending

criminal prosecution. It is not clear from the record just how he came to make these statements; that is, whether they were made in response to questions on some issues as to which he had been called to testify, or whether they were gratuitously made by him on questions not under inquiry by the grand jury. Others claimed to have heard Lewis make similar accusations outside the jury-room and in the presence of other people. Therefore, for the purpose of questions here to be considered, it need not be determined whether the statements referred to as made before the grand jury were privileged. The sheriff, upon learning about the claimed statements, expressed his displeasure quite vigorously, although there is very little in the record as to the exact character of statements made by him. Word soon reached Merritt Lewis that trouble of some sort was brewing. Rumors came to him that the "high sheriff" might give him trouble for such statements. His brother Jim went to Merritt's cotton field where he was picking cotton, and, according to Merritt's testimony, stated that "Mr. Gay told me that if you don't come to town and see him, trouble will be bad on you." Later, Lucius (who denominates himself as "a leader of my people"), another brother, and Merritt went into town to see the sheriff (at the instance of these two brothers), and there it seems Lucius was the spokesman to adjust Merritt's differences with the sheriff; and the following represents Lucius's version of what took place with the sheriff: "I talked to him about it, and he said to me these words, 'Lucius, Merritt he went into the grand-jury room and slandered me, and if he had been a younger man than he was that Thursday evening I would have had him in hell this morning,' and that is what he said to me, and I said to him, 'Please sir, don't hurt my brother, because he would not want to harm you in any way, if he did it he didn't mean to do it,' and I talked to him that way, and tried to make some kind of apologement to him, and he said carry him down to Fort Gaines, and I have put it in the Honorable King's hands, that is Mr. E. R. King, and he said whatever he says or does about it is all right with me." Lucius then explained that upon leaving the sheriff he came upon Mr. W. G. Gay, a brother of the sheriff, who promised "to do all I can for Merritt." They then made arrangements for Lucius, W. G. Gay, and Merritt to go to Fort Gaines on the following day and see Mr. E. R. King, the attorney to whom Sheriff Gay had

referred him. They went to Mr. King's office on the following morning, and there seems little dispute in the record as to what took place there. The version which Lucius gives of what transpired does not differ materially from the others who testified about it; and although presented in different language, his version is substantially as follows: Upon arriving at the office of Mr. King, the sheriff's brother and Mr. King conferred in his private office. After this conference Merritt and Lucius were admitted, and Mr. King stated to Merritt that it was a good thing he had come down, that he was "just fixing to come up and attach everything you got for $3000 slander," but stated that he would compromise the claim. There was some discussion. Merritt protested that he had no money, and that there was a debt on his farm. His brother Lucius insisted that he try to settle. Mr. King finally agreed to settle for $500, to be represented by two notes each for $250, one payable the following fall and the other a year later. The notes were then signed by Merritt Lewis, payable to J. C. Gay. Mr. King then gave Merritt some advice about thereafter "keeping his tongue." Lucius advised Merritt to sign the notes, saying it is best "even if it takes your overalls off your back." The version given by Merritt accords in substantial parts with what is stated above as coming from Lucius, Merritt testifying that he signed the notes because his brother Lucius advised him to do so.

Thereafter Merritt procured the services of an attorney who brought in his behalf a petition in equity against E. R. King and J. C. Gay, in which he charged that there had been a conspiracy between the two defendants to extort money from him upon threats of a criminal prosecution and physical violence; and that though he had not been guilty of circulating any false or untrue reports concerning the defendant, he was forced, not of his own free will, to execute said notes. The petition sought cancellation of the notes, injunction against their transfer lest they might be acquired by an innocent purchaser, and recovery of reasonable attorney's fees. It was alleged that the notes were without consideration, and were obtained under duress consisting of the threats above mentioned. By amendment it was alleged that the notes were executed because of the threat to take all of Lewis's property by virtue of a civil action. This allegation referred to King's alleged statement that he would attach Lewis's property on account of the sheriff's claim

of slander. Gay and King answered, denying any conspiracy or duress, and alleging that the plaintiff executed the notes voluntarily in settlement of the sheriff's claim of slander. They demurred on the ground that the petition set out no cause of action. The demurrer was overruled. Subsequently the answer was amended by asking for judgment against the plaintiff on the notes. An interlocutory injunction was granted, and upon a trial of the case the jury found in favor of the plaintiff on all of the issues except attorney's fees. On denial of a new trial the defendants excepted, assigning error also on the overruling of their demurrer.

■ Duress is considered as a species of fraud in which compulsion in some form takes the place of deception in accomplishing an injury, and, like fraud, constitutes a meritorious ground to set aside a contract executed as a result thereof. "The free assent of the parties being essential to a valid contract, duress, either of imprisonment or by threats, or other acts, by which the free will of the party is restrained and his consent induced, will render the contract voidable at the instance of the injured party. Legal imprisonment, if not used for illegal purposes, is not duress." Code, § 20-503. "Duress consists in any illegal imprisonment, or legal imprisonment · used for an illegal purpose, or threats of bodily or other harm, or other means amounting to coercion or tending to coerce the will of another, and actually inducing him to do an act contrary to his free will." § 96-209. "This definition is sufficiently comprehensive to include any conduct which overpowers the will and coerces or constrains the performance of an act which otherwise would not have been performed." *Dorsey* v. *Bryans,* 143 *Ga.* 186 (84 S. E. 467, Ann. Cas. 1917A, 172). Accordingly, it has been held that threats of physical violence or masked threats of punishment may constitute such duress as will authorize a party to avoid a contract executed on account of same (*Jones* v. *Rogers,* 36 *Ga.* 157) ; and that threats of bodily harm may amount to such duress as would avoid a contract executed solely on account of same. *Love* v. *State,* 78 *Ga.* 66 (3 S. E. 893, 6 Am. St. R. 234). See *Bond* v. *Kidd,* 122 *Ga.* 812 (50 S. E. 931). The threats must be sufficient to overcome the mind and will of a person of ordinary firmness. *Bond* v. *Kidd,* 1 *Ga. App.* 798 (57 S. E. 944) ; *Candler* v. *Byfield,* 160 *Ga.* 732 (129 S. E. 57) ; *Young* v. *Young,* 188 *Ga.* 29 (2 S. E. 2d, 622). While it may be

true that the mere general allegation of a threatened criminal prosecution for alleged slanderous words of the plaintiff would not be sufficient to show duress, it not appearing in this connection that a warrant had been issued or criminal proceeding commenced, or that there was any urgent or immediate necessity for the execution of said notes to prevent such criminal prosecution (see *Mallory* v. *Royston Bank,* 135 *Ga.* 702, 70 S. E. 586; *Patrick* v. *Wood,* 162 *Ga.* 137, 133 S. E. 870; *Sale City Gin & Mfg. Co.* v. *Dukes,* 22 *Ga. App.* 462, 96 S. E. 348; *Colclough* v. *Bank of Penfield,* 150 *Ga.* 318, 103 S. E. 490; *Bank of Penfield* v. *Colclough,* 154 *Ga.* 222, 114 S. E. 33; *Epps* v. *Anderson,* 28 *Ga. App.* 745, 113 S. E. 27; *Blalock* v. *Barrett,* 28 *Ga. App.* 444, 11 S. E. 697), and further that the mere threat of the bringing of a civil action would not constitute duress (*Bond* v. *Kidd,* supra; *Miller* v. *Keys Commission Co.,* 25 *Ga. App.* 100, 102 S. E. 555; *Williams* v. *Buchanan,* 17 *Ga. App.* 466, 87 S. E. 605), yet since it was distinctly alleged in the petition that the plaintiff was coerced into executing the notes by reason of "threats of defendant then made to do him [plaintiff] personal injury," the petition stated a cause of action as against a general demurrer, under the aforementioned principles.

While the petition stated a cause of action, a close and careful examination of the evidence discloses that there was not sufficient proof to sustain a verdict in favor of the plaintiff. There was evidence that he had made remarks to others, to the effect that the sheriff had been violating his oath and duty as a public officer, and that he had been "stealing from" the plaintiff. These were in their nature slanderous statements, and proof of them would clearly support an action for slander. See *Tillman* v. *Willis,* 61 *Ga.* 433. It is unquestioned in the evidence that it was freely contended by the sheriff that the plaintiff had uttered a slanderous statement about him; and there is nothing in the evidence sufficient to constitute a denial by the plaintiff that he made the statements which were attributed to him. "It is the general rule that where parties enter into an agreement compromising and settling a claim about which there is a bona fide dispute, they are bound by such agreement even though it thereafter appears that the contention of one of them was without foundation in law. See *Tyson* v. *Woodruff,* 108 *Ga.* 368 (33 S. E. 981); *Prince Hall Masonic Building Association* v. *Howard,* 36 *Ga. App.* 169 (136

S. E. 194); *Armour Fertilizer Works* v. *Wynne Mercantile Co.,*
40 *Ga. App.* 842 (151 S. E. 671). In order for such an agreement
to be valid, 'it is not essential that the matter should be really in
doubt; but it is sufficient if the parties consider it so far doubtful
as to make it the subject of compromise.' *Preston* v. *Ham,* 156 *Ga.*
223, 234 (119 S. E. 658). Such an agreement is valid and bind-
ing, not because it is a settlement of a valid claim, but because
it is a settlement of a bona fide controversy. *Armour Fertilizer
Works* v. *Wynne Mercantile Co.,* supra; 5 R. C. L. 877. The con-
sideration supporting it is the existence of a doubtful question, or
at least so considered by the parties as to make it the subject of
the compromise, and a compromise fairly and deliberately made
upon reflection, and the actual rights of the parties, whatever they
may be, can not affect the question. *Belt* v. *Lazenby,* 126 *Ga.* 767
(2) (56 S. E. 81); *Baxter* v. *Bank of Grantville,* 48 *Ga. App.* 458
(3) (172 S. E. 810)." *Hume* v. *Davison-Paxon Co.,* 57 *Ga. App.*
289, 292 (195 S. E. 318). "The law favors a settlement of dif-
ferences and a compromise of disputed claims between parties" (*Ty-
son* v. *Woodruff,* supra; *Smith* v. *Smith,* 36 *Ga.* 184, 191, 91 Am.
D. 761; *Emery* v. *Atlanta Real Estate Exchange,* 88 *Ga.* 321, 14
S. E. 556); and while the claim compromised must have been as-
serted in good faith, which is generally a question for determina-
tion by the jury (*Dickerson* v. *Dickerson,* 19 *Ga. App.* 269, 91 S.
E. 346), we think the evidence failed to show any lack of good
faith on the part of the sheriff in asserting the claim against the
plaintiff by reason of certain slanderous remarks alleged to have
been made by him concerning the sheriff, and showed that the prom-
issory notes were given as a compromise and in settlement of this
controversy. On the question of duress, we have searched the record
carefully, and do not find any evidence to sustain the charge. With
an appreciation of the veneration and sometimes fear in which the
"high sheriff" is held, especially by some members of the colored
citizens in this southern country, we can well understand how the
plaintiff, when he began to hear rumblings of the sheriff's wrath,
could have become frightened and fearful of the consequences to
himself. This is especially true when you consider that his two
brothers were anxiously prodding him and urging him to a prompt
adjustment. But apprehension on his part and on the part of his
brothers as to what the sheriff might do, even if it resulted in his

signing notes which but for the fear thus generated he would not have signed, does not measure up to the legal definition of duress as we have hereinabove found it to be stated. Duress must come from without, and not from within. It must be exerted by the other person or his agent, and can not be a creation of the mind of the person claiming that his will has been restrained by fear. The instant record fails to connect the sheriff, either by himself or by any one acting on his behalf, in any way with any of the rumors of danger to Lewis. So far as the evidence shows, he declined to discuss the matter with Lewis and his brothers, and merely referred them to his attorney. The attorney made no threat except to institute a civil action to recover damages in behalf of the sheriff for his alleged cause of action for slander; and, as already pointed out, this could not amount to duress in any legal sense. No conspiracy between the sheriff and King was shown, to unlawfully extort money from the plaintiff as alleged. The court erred in overruling the motion for new trial.

*Judgment reversed. All the Justices concur.*