### Ross, administrator, *vs.* Campbell *et al.*

1. Where a deed purported on its face to have been delivered, and was duly recorded on the day after it was made, it was admissible in evidence, without further proof to show that it was not only signed but delivered. The record of itself is presumptive proof of delivery.

(a.) The attestation of the deed by a magistrate raises a like presumption.

(b.) Where the grantor gave in the lot conveyed for taxation as the property of the grantee for several years succeeding the execution of the deed, this was a strong manifestation of the grantor's understanding that he considered the deed delivered and the title conveyed. It may be that the grantor would be estopped from denying his grantee's title; especially as he stated in conversations that he held the property as the agent of the grantee.

(c.) Where all of these circumstances united, in the absence of explanation or rebutting proof, they would show the delivery of the deed, although it was in the possession of the grantor when he died some years after its date.

Ross, administrator, vs. Campbell et al.

(d.) Where the record does not show the circumstances attending the execution of the deed, or who caused it to be registered or took it from the office after registration, or where it remained for a number of years thereafter, the presumption would be that the grantee received it, caused it to be registered and retained it in his possession.

(e.) The facts that the grantor remained in possession of the land for many years after the deed was made and recorded, and received the rents, issues and profits, without accounting for them; that he paid taxes on the property as his own, except for the first three years; and that he placed permanent improvements on the property, if unexplained, might have overcome the presumption of delivery. But such facts were explained, and there was no sufficient evidence on which to base a verdict finding against the delivery.

2. The presumption is that a party accepts whatever is for his benefit, and the idea of acceptance is necessarily involved in that of delivery. In determining what is sufficient delivery, the intention of the parties is the controlling element.

(a.) The law of this state does not make acceptance as well as delivery an essential requisite of a deed to pass title to land.

October 21, 1884.

Deeds. Delivery. Presumption. Tax. Estoppel. Title. Before Judge SIMMONS. Bibb Superior Court. April Term, 1884.

Reported in the decision.

G. T. & C. L. BARTLETT, for plaintiff in error.

BILLUPS & HARDEMAN; B. M. DAVIS, for defendants.

HALL, Justice.

The plaintiff, as administrator of Perry Dillard, brought suit in the statutory form for the recovery of the premises in question, which consisted of a half lot number 7, block 26, on Mulberry street, in the city of Macon, together with mesne profits, against Campbell and Rogers, who are the duly qualified executors of the last will of William Dillard, late of Bibb county, deceased. He claims under a deed executed by the testator of defendants, William Dillard,

to his intestate, which bears date the 6th day of May, 1847, was attested by two witnesses, one of whom was a justice of the peace, and was duly recorded in the proper office on the day after it bears date, for an expressed consideration of three hundred dollars. It conveys the land therein described, and purports on its face to have been " delivered." There seems to have been no change of possession of the premises after the execution of the deed. Perry Dillard shortly after that time removed to and resided in the state of Alabama, and thenceforth continued to reside there until his death, which occurred in 1859. William Dillard resided continuously in Macon until his death, on the 23d of May, 1883; in 1849 and 1850, he returned this lot to the receiver of taxes for the city as the property of Perry Dillard and as his agent; how it was returned in 1848, the year following that in which the deed was executed, does not appear, as the tax digest for that year was proved to have been lost. After 1850, it appears that William Dillard gave in this lot and paid taxes for it in his own name, and as his own property; he also improved it by erecting several buildings on it at his own expense; he rented these buildings and received the income from them. There is nothing in the record to show that he kept or rendered an account of this income to Perry Dillard or his successors; it is possibly true that he did not, as he devised it by his last will, executed two days before his death, to his daughter, Mrs. O'Connor. Shortly after executing his will, he delivered to one of his executors a tin box, which he said contained his deeds; among those in the box this deed was found by his executors, and produced on the trial of this case under a notice served upon them. It appears from the evidence that there was a house of two rooms and a kitchen on the lot when it was conveyed by William to Perry Dillard; it is pretty clear, however, that no improvements were put on it by William until after the death of Perry Dillard; indeed, most of them were made three or four years after the close of the late war in 1865, or

as defendant's witnesses say, in 1871 or 1872; it was shown that before the improvements were made, the property was worth for rent $8.00 per month, and afterwards $21.00. Mrs. Wynn, the sister of the Dillards, testified that Perry was in Macon in 1847, the year the deed was made, and had not been there since; she also testified to a conversa·tion with William Dil'ard in March, 1883, in which he said to her that the lot sued for was not his, but belonged to Perry Dillard, who bought it when he was last in Macon, and left it with him.   On Thursday before his death on Sunday, in another conversation with this witness in the presence of his daughter, Mrs. O'Connor, he said that the house and lot in which he lived he had bought and paid for with his own money, but as for the lot and houses in dispute, he said, " I have not got the scratch of a pen to show for them."   When asked where the deed was, he replied, " It is in the court house."   An attempt was made to impeach this witness, as to both these conversations, by showing that immediately after the last took place, she went into the kitchen, and said in the presence of Mrs. O'Connor and the cook, whose name was Charity, " As long as I have known William Dillard," or " as much talk as he and I have had about this property, I never heard before that the deed was in Perry."   This conversation she flatly denied, and said she did not go into the kitchen at all on that occasion; that she conversed with Mrs. O'Connor on the piazza about an entirely different matter, and left for her home to get rest, as she would have to sit up again that night.   The woman, Charity, was not sworn at all, but Mrs. O'Connor was, and gave this account of the matter on her direct examination: "She," Mrs. Wynn, "said she never heard my father say before that day that that deed was in Perry's name.   Never before that day had heard him say that there was a deed in Perry's name." On her cross examination, she stated that Mrs. Wynn came into the kitchen where she and Charity were, sat down in a chair near Charity's bed, and said, " Well, as

much talk as me and William have had together, I never knew that that deed stood in the way it did before; never heard him say so before." Admitted that her father said in the conversation testified to by Mrs. Wynn, that the property was in Perry Dillard, but didn't hear him say that the deed was recorded at the court house. Mrs. Wynn did not swear to anything said about the deed by William Dillard in the conversation that previously took place between them in March, 1883. There was nothing, therefore, in her conversation with Mrs. O'Connor and Charity, admitting that it took place as stated by Mrs. O'Connor, at all in conflict with any portion of the account she gave of the first conversation between her and William. The material portion of the last conversation was testified to by Mrs. O'Connor, viz.: that her father said " the property was in Perry Dillard's name." She, however, did not hear him say that the " deed was recorded," or " was at the court house." There is no positive denial of this part of the conversation. She did not hear it; her evidence on this point is merely negative and amounts to nothing. It is significant, too, that the woman, Charity, was not brought forward on this occasion to testify to these alleged contradictory statements of this important witness. She further testified that when William Dillard revealed this fact, Mrs. O'Connor remarked, " If we lose this property, we shall lose much." This is not denied; neither was the statement of Mrs. Wynn, that Dillard, in his last sickness, and about this time, seemed greatly troubled about this property.

A further attempt was made to discredit Mrs. Wynn by showing that she was inimical to Mrs. O'Connor, in consequence of her father's having destroyed a former will, in which Mrs. Wynn's son was made his legatee, and prompted by these feelings, she sought out the family of Perry Dillard and gave them information of Perry's title to this property. Mrs. Wynn denied that she entertained such feelings to Mrs. O'Connor, or that she was actuated by the

motive attributed to her in imparting the information to the family of Perry Dillard. She says that the first will was intended to subserve a temporary purpose and prevent the marriage of Mrs. O'Connor with her husband; that, subsequently to the marriage and during testator's sickness, Mrs. O'Connor was by her request permitted to read the will; that the testator then ordered it to be burned, and it was burned by Mrs. O'Connor; that she was at the house of William Dillard when the last will was written; was not in his room, but in the kitchen, when it was executed. The widow of Perry Dillard, in answer to interrogatories, testified that she had seen this deed in her husband's possession, that she had his papers after his death, and that this must have been lost or stolen when she removed from Alabama to Mississippi, after her husband's death.

Counsel insist that this testimony was manufactured to meet the exigencies of this case, and is false; and it may be that the witness was mistaken as to the fact about which she testifies, but the record affords no reason for imputing to her wilful perjury. It was sufficiently shown that the rents of the premises exceeded the cost of the improvements put thereon by William Dillard, together with the purchase money named in the deed.

The jury returned a verdict for the defendant, and the plaintiff made a motion for a new trial on various grounds, which was refused, and this refusal brings the case here for review.

The only question on which it turns is, whether the plaintiff's proof establishes the delivery of the deed made by William to Perry Dillard, and whether, if that fact is sufficiently established, it has been disproved by the testimony offered by the defendants; or rather, whether there is any proof which would authorize a conclusion that the deed was not made and delivered. It is not denied that this was a proper question for the jury, or that it was fairly submitted under correct instructions from the court.

The unquestioned proof of the complete execution of the deed, including delivery to the feoffee, are: 1st, That it purports on its face to have been delivered. 2d, That it was duly recorded on the day after it was made; and being thus recorded, it is admissible in evidence, under our law, without further proof, to show that it was not only signed, but delivered. 11 *Ga.*, 640, [5]. The record of itself is presumptive proof of its delivery. 17 *Ga.*, 275; 47 *Id.*, 217. In Young *vs.* Guilbeau, 3 Wallace, 641, Field, J., remarked that the "registry of a deed by the grantor is entitled to great consideration upon this point, and might, perhaps, justify, in the absence of opposing evidence, a presumption of delivery." See also Tiedman on Real Property, §812, and cases cited in note 2. 3d. It was attested by a magistrate, and this authorizes a like presumption. 53 *Ga.*, 59, citing 17 *Id.*, 62. 4th. The grantor gave in the lot conveyed by it for taxes as the property of the grantee for at least two years, and most probably for three years, immediately succeeding its execution. This was a strong manifestation of his understanding that it conveyed title to the grantee, that he considered it delivered, and was at least a solemn disclaimer on his part of title to the property. It may be that such an act, both upon principle and authority, would estop him from denying the title of his grantee, (11 *Ga.*, 258); especially as it was shown, 6thly, not only by these returns, but by his conversations with Mrs. Wynn in 1883, that he held this property as the agent of Perry Dillard, and in so doing sustained to him confidential relations. While these facts do not conclusively establish the delivery of the deed, and are open to explanation, yet if they are not repelled by proof of other attendant or subsequent circumstances, modifying or impairing their force, they afford strong, if not decisive, evidence of the fact. The record is silent as to the circumstances attending the execution of the deed; it does not appear whether the grantee was present and received it from the hands of the grantor. In the absence

of such testimony, the presumption is that he was so pres-ent and did so receive it; neither is it shown who caused it to be registered, or when registered, who took it away from the office in which it was registered, or what disposition was made of it, or in whose possession it was for a number of years after these events. Again, the legal presumption is that the grantee did all these things, and when they were accomplished, that he took and kept possession of the deed. The subsequent circumstances, had they not been explained; would have afforded some evidence that should have been considered as overcoming this presumption. Notwithstanding these facts, the grantor remained in possession of the property continuously for many years after the deed was made and recorded, receiving without account its rents, issues and profits, and from 1851 up to the death of the grantee in 1859, he gave in and paid taxes on the property as his own, and subsequently up to his own death in 1883; and in addition he put permanent and valuable improvements on the property in 1871 or 1872, and lastly, the deed was found in his possession at his death. These facts, had their effect not been impaired and overcome by the other proof, might have justified the jury in inferring the non-delivery of the deed and in so finding. They were successfully met, however, and their force greatly weakened, if not destroyed, when it was shown that the defendant's testator held and managed this property as the agent of the plaintiff's intestate; that by his unequivocal acts, as well as by his after declarations, he admitted that he controlled it in this capacity; he at first gave it in for taxes as agent, but subsequently changed this in the lifetime of the grantee, and gave it in as his own property, but there is no direct proof that the grantee was apprised of the change, nor are there any circumstances in evidence from which it could be legitimately inferred that he had such knowledge; he was not in a situation to be charged with notice; he was, during all the time, remote from the scene of the occurrences; they transpired in Ma-

con, Georgia, while he resided in the state of Alabama. It is not without significance that no improvements were put on this lot while he lived, and that no attempt was made to place them there until more than eleven years subsequent to his death. That the grantor had possession of the land after he made the deed, is entirely consistent with the terms upon which he declared in 1883 he held it. He controlled and managed as the grantee's agent, and this fact goes far to explain his possession of the deed at his death. That he twice, towards the close of his life, spoke of this property, and on both occasions stated that the title was in the plaintiff's intestate; that in his last days he manifested much concern in reference to the matter, and executed his last will on the day after he had the last conversation upon the subject, and was careful in that will to describe specifically this piece of property, when none of his property, about which there was no dispute, is thus particularly designated, are circumstances that go far towards sustaining the plaintiff's claim and disproving the defence of his opponent. The time when this last will was made, with the minutely particular description of this lot therein, when taken in connection with the remainder of its contents and the conversation and manifestations of feeling that preceded its execution, are circumstances fraught with suspicion, and leave no sufficient evidence on which to rest the verdict returned in the case. The verdict is contrary to law, and is without evidence to support it, and on this ground of the motion a new trial should have been granted.

It was insisted in argument here, with earnestness and confidence, and with no inconsiderable ingenuity, that the delivery of the deed alone was not sufficient to vest title to land it purports to convey in the grantee ; that there must also be an acceptance thereof by him, and in this case there is no proof of any acceptance. We think there was proof of the acceptance. As appears from the face of the deed, both parties were residents of the county of Bibb

when it was executed. The grantee, as is shown by other evidence in the case, was then an unmarried man, and removed in that year to the state of Alabama, where he was married, and never afterwards returned to Macon or resided in the state of Georgia. The general presumption of law is that a party accepts whatever is for his benefit, and in. dependently of this, the idea of acceptance is necessarily involved in that of delivery. A complete delivery *ex vi termini* imports an acceptance  Any other rule would result in injustice and wrong in many cases, as in this, where all the parties and witnesses to the transaction are shown to be dead. The survivor of all these was William Dillard himself, and there is certainly nothing in his latest conversations, or any of his previous acts and declarations, from which any one would be authorized to infer that it was not his intention to deliver this deed, or that he, in fact, did not deliver it, and that Perry Dillard did not accept it. "In determining what is a sufficient delivery, it is found that intention is the controlling element," and numerous instances of facts by which this intention is manifested are given in all the elementary books on real property law. See, among others, Tiedman on Real Prop., §813, and citations in note (2.)

But apart from all this, our law does not make acceptance, as well as delivery, an essential requisite of a deed to pass title to land. Code, §2690.

On this subject the court laid down the correct rule in his charge to the jury, and were there any evidence at all to warrant their finding, however slight, we would be compelled, under our uniform rulings, to let it stand. We think there was none. On another hearing, all that is dark or doubtful about this old transaction may, by additional proof, be made clear and certain. We are satisfied that there should be a further and fuller investigation of the matter, and therefore order the judgment reversed.