## PRESTON *v.* HAM.

1. Where the plaintiff, as heir at law of the grantor, in an action against the grantee for cancellation of certain deeds for non-delivery thereof, attested one of these deeds as ordinary, such attestation would raise a rebuttable presumption of the delivery of the deeds; and he would not be bound conclusively by such attestation, if it should appear that the deed so attested was not actually delivered.

(*a*) The attestation of the other of said deeds by an officer authorized by law to attest it would likewise raise a rebuttable presumption of its delivery; but such presumption did not become conclusive against the plaintiff by the mere failure of the officially attesting witness to explain the circumstances under which such deed was executed, if its non-delivery otherwise appeared.

(*b*) Compromises of doubtful rights are upheld by the public policy of this State and by the decisions of this court, especially when they partake of the nature of family arrangements.

(*c*) The termination of family controversies affords a consideration which is sufficient to support a contract for such purposes.

(*d*) To render valid such a compromise agreement, it is not essential that the matter should be really in doubt; but it is sufficient if the parties should consider it so far doubtful as to make it the subject of compromise.

(*e*) Where a husband claimed certain real estate and personal property as sole heir at law of his deceased wife, and a sister of the wife claimed the same as donee of the wife (the real estate under deeds, and the personalty under parol gifts, from the wife), and the husband and sister settled this controversy by an agreement under which the husband was to have the personalty, and the sister was to have the real estate, and where this agreement was performed by the sister delivering to the husband such personalty and retaining such realty, the husband would be bound by this agreement, and would be equitably estopped from prosecuting an action against the sister for cancellation of said deeds and for a decree declaring such realty to be his property.

2. The court erred in giving to the jury the instructions which are set out in the second division of the opinion in this case.

3. This court held, when this case was here before, that the evidence touching the arrangement by which these deeds were placed with the cashier of the Bank of Flovilla to be kept for the grantor, and, if anything should happen to her, to be delivered to the grantee, authorized the jury to find that this transaction was testamentary in character, such deeds not having been delivered by the depository to the grantee during the lifetime of the grantor; and this ruling is now the law of the case.

(*a*) Under this ruling the jury under the evidence was authorized to find, on the last trial, that the attempted disposition of this property under this arrangement was testamentary in character and did not amount to a valid conveyance thereof.

(*b*) Where the delivery of a deed to the grantee is insufficient in that the grantor has not effectually parted with control over such deed, it may be rendered effective by subsequent acts and declarations of the grantor showing his intent to part with such control, although the depository is not informed of the grantor's intention.

(*c*) Where after the deposit of these deeds with the cashier of the bank the grantor directed her kinswoman to get them at once and deliver them to the grantee, such direction amounted to a verbal delivery to the grantee, although they may not have reached the hands of the grantee until after the death of the grantor; provided at the time of

giving such directions the grantor had strength of mind sufficient to fully and clearly understand the nature of this act.

(d) While it appears from the uncontradicted evidence that these directions were given by the grantor, there is some evidence tending to show that she was mentally incapable of transacting business at the time; and for this reason we can not say as a matter of law that a verdict was demanded for the defendant on the ground that these deeds had been actually delivered, the question of fact raised as to the grantor's mental incapacity being one which can only be passed upon by the jury.

No. 3582. September 6, 1923.

Equitable petition. Before Judge Searcy. Butts superior court. December 19, 1922.

This is the second appearance of this case in this court. See *Ham v. Preston,* 152 *Ga.* 244 (109 S. E. 505), where the allegations of the petition are substantially set out. Attached to the petition are copies of the deeds — which the plaintiff, J. H. Ham, seeks to have canceled. The consideration stated in each of these deeds is love and affection and $5. One is dated Oct. 16, 1917, and its attestation clause is as follows: " Signed, sealed, and delivered in the presence of us: Maggie Jean Foster. J. A. Mc-Michael, J. P." This deed conveys a lot and dwelling in the town of Flovilla. The other deed is dated July 14, 1916, and its attestation clause is as follows: " Signed, sealed, and delivered in the presence of us: S. J. Foster, J. H. Ham, Ordinary." The official witness of this deed is the plaintiff. The answer of the defendant, Mrs. W. W. Preston, denied that Mrs. Emma Ham owned the real estate described in said deeds at the time of her death. She admitted the execution of such deeds by Mrs. Ham. She denied that Mrs. Ham, some time prior to her death, deposited said instruments with other papers with J. T. Gibson, cashier of the Bank of Flovilla, as her agent, and that they remained in the hands of said agent until the time of her death. She admitted that said instruments were recorded on Dec. 19, 1918. She denied the allegation of the petition that said deeds were never legally delivered to her. She further denied the allegation of the petition that they were void and did not pass title to the property therein conveyed.

On the trial of the case the following evidence was introduced: J. T. Gibson testified: I have been cashier of the Bank of Flovilla for fifteen years. Knew Mrs. Emma Ham. Some time prior to her death she delivered some papers to me. The papers were in

this envelope. I made the notation thereon that they were Mrs. Ham's papers. Sent those papers to Mrs. Preston by her husband. Mrs. Ham brought these papers to me one afternoon after I closed. She came in and said: " Here are some papers; keep them for me; and if anything happens, give them to Bess," Bess being Mrs. Preston. That envelope was sealed and had rubber bands around it. I put the papers in the vault. That was in September or October before she died in December. From that time until she died she said nothing to me about these papers. She brought other papers to our bank and asked me to keep them for her. After she died Miss Lucy Goodman, now Mrs. Sandburg, called me up over the 'phone and said Cousin Emma Ham said as soon as she died to get her papers and deliver them to Mrs. Preston. Delivered papers to the husband of Mrs. Preston the Monday after Mrs. Ham was buried, and asked him to carry them to Mrs. W. W. Preston. Mrs. Ham was Miss Bloodworth. She first married Mr. Partridge. When she married Judge Ham she was a widow. She had no children. It was in September or October, 1918, that I had the talk with Mrs. Ham about the papers in controversy here. She had been to the hospital before that time. I think it was in 1917. I understood she had been there for some serious operation at some time. The papers were left with me about September or October, 1918. These papers were not taken out of our vault from the time they were left there to the time delivered to Mr. Preston for his wife. On the other paper is this entry: " Paper to be delivered to my sister, Mrs. W. W. Preston, in case of my death." Understood from her directions that I was to deliver the papers to Mrs. W. W. Preston when Mrs. Ham died. I took the papers to deliver them if she died, as she said if anything happened to her — I supposed that is what she meant.

J. R. Bias testified: Knew Mrs. Emma Ham. Heard her say something about her property while I was there. She said she had purchased a home on Mulberry Street in Jackson, and if she could collect what her brother-in-law owed her and sell her home, she could pay for them a home and be better satisfied. This was between September and her death.

Statement of defendant's counsel on the former trial that these deeds were in a package delivered to Preston for his wife by J. T. Gibson, cashier of the Bank of Flovilla, was introduced.

Plaintiff, in his own behalf, testified: Mrs. Preston came to my house on Tuesday after my wife was buried on Sunday. She came in very much excited and said everything my wife had was hers. She said, " I did not know of any such papers until Miss Lucy Goodman came to my house," and stated that " Mr. Gibson gave the papers to Mr. Preston and he brought them to me." Mrs. Ham was Mrs. Preston's sister. Mrs. Preston did not go to the funeral. She was crying on Tuesday because I said, " I will scrap you in the courts until kingdom comes." I told her that because she said that everything my wife had belonged to her. They came down to my house. As they came in they pulled out some papers and asked me to go into another room to see them. As we started to step in she said: " I want to inform you that everything my sister had belongs to me." She showed me one deed; she did not show me the other one. She said: " Here's the deed." I said: " Well, Miss Bess, do you think I am a born fool ? " She said Mr. Gibson gave the papers to her husband and her husband gave them to her. Mr. Walker Preston was present. He said that Mr. Tom Gibson gave the papers to him. That was the deed that was in the envelope. Mrs. Preston was present and heard what he said.

J. T. Gibson, recalled, testified: I delivered the package of papers Mrs. Ham left with me to W. W. Preston. Did not deliver them until the next morning. Delivered them on Monday. Saw Mr. Preston that afternoon after I delivered the papers to him. He had two deeds and three time certificates of the Jackson bank. He said he got them out of the package I gave him.

T. W. Nelson testified: Knew Mrs. Ham. A few month's prior to her death I heard her make no statement, with reference to her property at Flovilla, other than that if she could sell her property at Flovilla she would not have to borrow any money. This was a month or little more before she died. I could not say whether it was three or four months before she died. Have no recollection when it was.

John B. Mays testified: Knew Mrs. Ham while she was at Jackson. Heard her state something with reference to disposition of her property at Flovilla. This was two or three weeks before she bought the Carter house on Mulberry Street. She said she was giving notice she was going to move and get a place closer up to

her business.  She was going to dispose of her property at Flovilla, and she and Judge Ham were going to buy the Carter place together.  She said as soon as she could dispose of her property at Flovilla she and Judge Ham were going to buy.

T. W. Ham testified: Prior to Mrs. Ham's death I carried her to Flovilla.  When she got there she went to the bank.  Did not go with her to the bank.  She had a bundle of papers in her lap.  She had a package and said she was going to give Mr. Gibson the papers to keep for her.  That was between the last days of August and the fifth of September.  Heard her tell the lady in the house not to move out, that she wanted her to stay there.  She said she had been talking about selling, but had decided not to sell.  That was close to the time I carried her and the papers down there.

Mrs. Lucy Goodman Sandburg testified: Mrs. W. W. Preston is my cousin.  Mrs. Emma Ham was also my cousin.  Was with Mrs. Ham while she was in the hospital in Atlanta.  It was on Saturday morning after Cousin Emma was there that Mrs. Preston said:  " I am not physically strong enough to go to sister.  I want you to please go."  I went in the afternoon and stayed until Sunday evening.  Mrs. W. W. Preston did not go to Atlanta during that time.  She was not physically able to make the trip.  One of her children was born soon after that, and that was the reason.  Had a conversation with Mrs. Ham with reference to some property.  She said:  " Lucy, I know the end is near.  I want you to do something for me.  You know I have deeded Bess my house and store in Flovilla.  You understand why.  These papers are with Mr. Gibson in the Bank of Flovilla.  I want you to get them at once and deliver them to Bess."  I came back from the hospital Sunday evening, the next day after she told me that.  I did not do what she told me to do, because I was teaching, and had the " flu," and it was bad, rainy weather.  I did not understand it was necessary to take the papers right then.  I had a conversation with her on Sunday about it.  She said: Lucy, don't forget to get the papers from Mr. Gibson and give them to Bess right away."

Mrs. W. W. Preston testified: I am a sister of Mrs. Ham.  She was the only member of the family living at the time.  Knew Judge Ham's family.  His family and mine were on friendly terms, and continued so until after his marriage, as far as I know.

He and Mrs Ham were often in my home for the week-end. When Mr. Partridge was living I lived in the house with them. I lived with them until Mr. Partridge's death and until my marriage. I had been in Flovilla about two years, and lived with Mrs. Ham. Had a conversation with Mrs. Ham about these deeds. About Oct. 21, 1918, my birthday, she called me up over the 'phone and said she had made me a deed to the houses at Flovilla as a birthday present. She said it was in a safe for me. She told me she had made a deed to the house and store to me. She told me the same thing when she went to Atlanta the last time for the operation, about Dec. 6, 1918. That is the property in controversy. The house and store were all the houses she had in Flovilla. She asked me to take her suit-case at that time; said she would have no further use for it. I did not go to Atlanta when Mrs. Ham was sick. I was not able to go. They would not let me go. I had a talk with Judge Ham about these matters. He called Monday night and asked if we had any papers from the Bank of Flovilla. I was not able to go to the 'phone. He said three $100-certificates — three papers $100 each — one insurance policy. He discussed the matter the next day. We walked in and I apologized for coming to his home, as I intended to see him at the court-house. He said he did not have time to confer with me. Told him I had brought the papers for him to go through them. These were the deeds we had been speaking about. I knew the deeds were the ones Mrs. Ham wanted me to have. He looked through both papers. He said he knew about that; that he witnessed that paper (referring to one of the deeds). He said it was all right. He said the three $100-dollar certificates belonged to him and the insurance policy belonged to him. The insurance was $1000 originally. Mrs. Ham had carried it on my life after Mr. Partridge's death. It was always her intention to give me that money. That money was to be paid on her burial expenses, if any was left at the time of her death. Judge Ham said unless I turned over the insurance policy and certificates to him he would scrap me until kingdom come; but if I did turn them over to him I could have the house and the store. He said, " You can put that in writing." We parted and I thought we parted in perfect friendship. He turned over the deeds to me and took the money to pay the funeral expenses. I said I never intended to take everything from him.

He gave the deeds back to me, and said to take them and have them recorded — they have never been recorded. Judge Ham said the taxes had not been paid on the property. He said he would look after it for me, but Mr. Preston paid the taxes and Judge Ham gave him the tax receipts.

(Cross-examination) : Mrs. Ham had already given Mr. Walker Preston a bond for title to the storehouse. Judge Ham knew Preston had the bond for title. I had these deeds when I went to his home that day. They were the deeds Mr. Walker Preston brought me from the Flovilla bank. I had never seen these deeds before he brought them. Never said anything to Mr. Gibson about them. Never mentioned them to anybody else. During these months that I knew Mr. Gibson had these deeds I did not tell my husband. As to why I did not go and get those deeds, I would not take anything from my sister. I did not take the property at all when she was living. " Q. Was it because you realized' that you had no right to the property until she died? A. It never occurred to me that I would outlive Mrs. Ham. I wanted her to use the property to make her own life more comfortable. Q. Was that the reason you say that you didn't realize that you had a title? A. I always felt the property was mine." I did not take charge of it, because I had a home and Mr. Preston was working for me. The house of Mrs. Ham was painted late in the summer of 1918. I did not pay for it. Mr. Gibson collected the rents on it for Mrs. Ham. I did not receive any of the rent except for the first month after she died. Never mentioned the matter to Mr. Gibson during those years. When I came down from Atlanta I asked Mr. Gibson to put the papers in the safe and keep them. That was after Mrs. Ham died. Mrs. Ham did not call me over the telephone in October before going to the hospital in December, and say she had a birthday present. " Q. And you said you would consider it would be a birthday present? And that was in October, just before the twenty-first, in 1918; and was that the first you knew of the deeds? A. Yes, sir. She said she had made me the deed. At the time she did not say she made it that day. That was the the first time I knew about it. I did not know whether the deeds had been carried to Mr. Gibson. Mrs. Ham told me when she went to the hospital the last time that the deeds and papers were with Mr. Gibson at Flovilla, and she said for me

to get them. That was about the first of December. It was about the sixth of December that she went to the hospital. Two hours before she left home she made a statement. She said for me to go and get these deeds and papers. She said that Judge Ham was willing for me to have the property. She told him, and he was willing for the property to go to me. When she said she had bought a home, I told her she ought to trade her Flovilla property and pay it all up. She said she would not do it. I think that was in September. Mrs. Ham consulted me about painting the house that summer. She asked me what color I wanted it painted, and brought the color cards, and asked me to select the colors.

Plaintiff introduced in evidence the envelope identified as the one in which the two deeds in question were contained when delivered to Gibson and on which by him was written: " For Mrs. W. W. Preston. Mrs. J. H. Ham's papers;" also an inside wrapper on which was written: " Papers to be delivered to my sister, Mrs. W. W. Preston, in case of my death. 7-14-16. Emma G. Ham." Plaintiff also introduced the two deeds from Mrs. Ham to Mrs. Preston. On the deed dated July 14, 1916, was this indorsement: " State of Georgia, Butts County. Office of Clerk Superior Court. Filed for record December 17, 1918, at 3:30 p. m.; recorded December 17, 1918, Book No. 1, page 399. S. J. Foster, Clerk Superior Court. To be delivered at my death. 7-14-16. Emma G. Ham." On the deed of October 16, 1917, was this indorsement: " State of Georgia, Butts County, Office of Clerk Superior Court. Filed for record December 19, 1918, at 2:10 p. m.; recorded December 19, 1918, Book No. 1, page 405."

Mrs. Mary H. Bloodworth testified: Mrs. Emma Bloodworth Partridge Ham was my sister-in-law. I was the only one in the room when she died in the Piedmont Sanitarium in Atlanta. I had a conversation with her prior to that time, in regard to the disposition of her property. That was the time she was in the hospital for her first operation. Do not remember what year that was. It was more than a month before her death. She explained to me why I was using a check of Walker Preston's to pay her hospital expenses. I paid her bills every week, and she explained to me she had borrowed money from Walker and had deeded everything she had to Bess; and if she was not able to pay Walker the $200 back, she was going to give them the brick store and home

in Flovilla. She had deeded this to Bess. She said Bess had helped her to buy that home, and she thought that was the proper thing to do. She talked quite at length about the little property, how she and Bess had worked for it, and it was nothing but right that Bess should inherit it. Mrs. Preston and Mrs. Ham were my sisters-in-law. There were close relations between Mrs. Ham and Mrs. Preston.

Mrs. Howard L. Smith testified: I was Mrs. Ham's niece. Was present during her last illness when she had a conversation with Mrs. Lucy Sandburg. She told Lucy to get her papers from Mr. Gibson at Flovilla and take them to Aunt Bess. That was Sunday afternoon before she died the next Saturday morning. She did not state which papers. (Cross-examination): Mrs. Ham told Miss Lucy that when she died, to go and get these papers and give them to Miss Bess. Judge Ham was at the hospital at the time, but was not in the room. He had gone to the telephone.

There was medical expert testimony tending to prove that the grantor, during her last illness while at the hospital in Atlanta, was mentally incapable of transacting business. There was also medical and lay testimony tending to show that during this period she was mentally alert and fully capable of transacting business.

The verdict was in favor of the plaintiff. The defendant moved for a new trial, which was denied, and error was assigned upon that judgment.

*John R. L. Smith, Grady C. Harris, O. M. Duke,* and *Brown & Brown,* for plaintiff in error.

*Joel B. Mallet, H. M. Fletcher,* and *C. L. Redman,* contra.

HINES, J. (After stating the foregoing facts.)

1. Was a verdict demanded in favor of the defendant? That is her contention. This contention is based upon three grounds. One is that the plaintiff is estopped from asserting title to the premises in dispute, by his conduct and admissions. The second is that the plaintiff and the defendant were both claiming the estate of the deceased wife, the former as her sole heir at law, and the latter as her donee, and that they entered into a compromise agreement by which the plaintiff was to have certain portions of this property, and the defendant, who was the sister of the wife, was to have the premises in dispute; in consequence of which agreement the defendant delivered to the plaintiff the property

which the latter was to have, and the plaintiff instructed the defendant to have the deeds to the premises in dispute recorded. The third is that the deeds were actually delivered. Was the plaintiff estopped by his admissions and conduct?

The plaintiff, as ordinary, was one of the attesting witnesses to one of the deeds from his wife to the defendant. Such attestation by him, he being an officer authorized by law to witness the same, is presumptive proof of the deed's delivery. *Ross* v. *Campbell,* 73 *Ga.* 309; *Mays* v. *Fletcher,* 137 *Ga.* 27 (72 S. E. 408). Such a presumption, however, is a rebuttable one. It is not more conclusive upon the attesting witness than it would be upon the grantor. Whether this presumption was rebutted was a question for the jury, under the facts of this case. The mere fact that the plaintiff officially attested its execution was not a binding admission on his part that it had been delivered, any more than the execution of the deed by the grantor, containing a recital of its delivery, would conclusively bind the maker or her heirs. The instant case is different from those wherein parties take and receive benefits under deeds, and thus estop themselves from attacking them as void for lack of delivery or other defect, and from asserting title to the premises conveyed by such instruments against the grantees therein. *Barsky* v. *Posey,* 11 Del. Ch. 153 (98 Atl. 298); *Fuller* v. *Johnson,* 139 Minn. 110 (165 N. W. 874); *Johnson* v. *Hughart,* 85 Ky. 657 (4 S. W. 348); *David* v. *Williamsburg,* 83 N. Y. 265, 38 Am. R. 418); *Keirsted* v. *Avery,* 4 Paige (N. Y.) 9. In the cases cited parties were held equitably estopped from attacking deeds under which they had received benefits, and from asserting title adverse to the grantees; and they were properly held so estopped. In the case at bar the husband did not receive any benefit under the deeds executed by his wife. For this reason he would not be estopped by his mere delivery of these deeds after his wife's death, or by his assertion that they were valid instruments, or by his consent for the grantee to have them recorded. So we are of the opinion that the husband would not be estopped from asserting title to these lands as the heir at law of his wife, by conduct on his part which might amount to an admission that the claim of title to the premises in dispute by the grantee in the deeds from his wife was valid and all right. The grantee did not act to her injury on the faith of such admission,

and the plaintiff did not receive any benefit under these deeds. Hence he would not be estopped by such conduct and admission alone.

But it is insisted that a verdict in behalf of the defendant is demanded, by reason of the compromise agreement made between plaintiff and herself, touching the estate of plaintiff's wife. The facts touching this compromise agreement are fully set out in the statement of facts, and need not be repeated. Compromises of doubtful rights are upheld by public policy and by the decisions of this court. This is especially true when they partake of the nature of family arrangements. It is well settled that in equity the termination of family controversies affords a consideration which is sufficient to support a contract made for such purposes. *Watkins* v. *Watkins,* 24 *Ga.* 402; *Fulton* v. *Smith,* 27 *Ga.* 413; *Smith* v. *Smith,* 36 *Ga.* 184 (91 Am. D. 761); *Belt* v. *Lazenby,* 126 *Ga.* 767 (56 S. E. 81). In order to render valid the compromise agreement, it is not essential that the matter should be really in doubt; but it is sufficient if the parties consider it so far doubtful as to make it the subject of compromise. *City Electric R. Co.* v. *Floyd County,* 115 *Ga.* 655 (42 S. E. 45); *Belt* v. *Lazenby,* supra. But it is necessary, in order to furnish a consideration for such compromise agreement, that the contention be made in good faith and be honestly believed in. *Dickerson* v. *Dickerson,* 19 *Ga. App.* 269 (91 S. E. 346). Evidence in the record discloses that the defendant claimed certain real estate and personal property of the deceased wife of plaintiff, the real estate under deeds of conveyance and the personalty under verbal gifts; and that the plaintiff, as sole heir at law of his wife, claimed a part or all of this property. The plaintiff and defendant settled this controversy by an agreement by which the plaintiff was to have certain certificates of deposit claimed by the defendant, and the defendant was to have the premises in dispute. This agreement was performed by the defendant, she turning over to plaintiff these certificates of deposit and the insurance policy, and the plaintiff agreeing for her to keep the premises in dispute, and directing her to have the deeds thereto recorded. The plaintiff did not deny the above agreement and its performance, as claimed by the defendant. The evidence as to said agreement and its performance by the defendant is uncontradicted. There is no evidence from which the inference

can be drawn that the defendant did not in good faith and honestly believe that she was entitled to the personal property to which she relinquished her claim, and which she turned over to plaintiff in settlement of the controversy between them. The facts and circumstances appearing from the evidence adduced on the trial show that the claim and contention of the defendant were honest and in good faith. The rights of the respective parties were in doubt, or were thought by them to be doubtful. They settled their controversy by a compromise agreement. If the defendant in good faith and honestly believed in her contention that she was entitled to all of this property, including the premises in dispute and the personal property turned over to plaintiff by her, and if in settlement of this controversy she and plaintiff entered into a compromise agreement as above mentioned, then the making and performance of such agreement would be binding upon the plaintiff, and he would be equitably estopped thereby from asserting title to the premises in dispute against the defendant. We see no good reason why both of these parties should not stand by this agreement. The plaintiff is now equitably estopped from repudiating this agreement. It follows as a consequence that a verdict in favor of the defendant on this issue was demanded under the evidence; and the court erred in not granting a new trial.

2. The court charged the jury as follows: "that all instructions given at the hospital or at any other time with reference to the delivery of the deeds by Mrs. Ham should be construed by the jury to mean a delivery during her life, and not a delivery after her death." The defendant, in her motion for a new trial, excepts to this charge and assigns error thereon, on the grounds: (1) that it is not a correct statement of law applicable to the case; (2) that it improperly qualified the preceding portion of the charge; and (3) that it withdrew from the consideration of the jury the contention of the defendant that Mrs. Ham had given unconditional, positive, and absolute directions for the delivery of the deeds in question to the defendant upon her death. We think the court erred in this instruction to the jury. The jury were authorized to find that the directions touching the delivery of these instruments to the grantee, given by the grantor at the hospital during her last illness, amounted to a total and absolute renunciation by the grantor of dominion over these deeds, and a

valid delivery of them to the grantee. A deed may be delivered by acts without words, by words without acts, or by both. *Wellborn* v. *Weaver,* 17 *Ga.* 267 (7) (63 Am. D. 235) ; *O'Neal* v. *Brown,* 67 *Ga.* 707, 712. " The delivery," says Touchstone, " is either actual, i. e., by doing something and saying nothing; or else verbal, i. e., by saying something and doing nothing, or it may be both; and either of these may make a good delivery and a perfect deed." 1 Shep. Touch. 57. Even though the deed reaches the grantee after the death of the grantor, having been previously left with a third person for the use of the grantee, it is a good delivery. *O'Neal* v. *Brown,* supra; *Puett* v. *Strickland,* 144 *Ga.* 193 (86 S. E. 547).

This instruction was calculated to mislead and confuse the jury, and to impress upon their minds the idea that these deeds had to reach the grantee in the lifetime of the grantor. This error is not cured by the fact that the court in another portion of his charge gave to the jury correct instructions on this point. The jury should not be left to decide between conflicts in the charge. *Central of Ga. Ry. Co.* v. *Johnston,* 106 *Ga.* 130 (32 S. E. 78) ; *W. & A. R. Co.* v. *Clark,* 117 *Ga.* 548 (44 S. E. 1) ; *Morrison* v. *Dickey,* 119 *Ga.* 698 (2) (46 S. E. 863) ; *Savannah Electric Co.* v. *McClelland,* 128 *Ga.* 87 (2) (57 S. E. 91). The giving of this instruction requires the grant of a new trial.

3. Was a verdict in favor of the defendant demanded because the proof on the last trial showed that the deeds in question had been actually delivered? When this case was here before, this court held that the evidence about the arrangement by which these deeds were placed with the cashier of the Bank of Flovilla, to be kept for the grantor, and, if anything should happen to her, for delivery to the grantee, authorized the jury to find that this transaction was testamentary in character, and did not constitute a valid conveyance of these premises to the defendant. This will become manifest by an examination of the case of *Baxter* v. *Chapman,* 147 *Ga.* 438 (94 S. E. 544), on which the decision of the court on that point was put. This is now the law of the case. This being so, the jury could still find from the same evidence that the attempted disposition of this property by this arrangement was testamentary in character, and that the deeds in question had not been delivered, and did not amount to a valid conveyance thereof. So it becomes necessary to inquire whether the evidence intro-

duced on the last trial has altered the situation, and made a case which demanded a finding that these instruments had been delivered so as to make a valid conveyance of these premises to the defendant. While the deposit of these deeds with the cashier of the Bank of Flovilla was held by this court to be testamentary in character from lack of delivery during the lifetime of the grantor, if thereafter the delivery of these instruments was completed, such infirmity would be removed, and their testamentary character would be swallowed up in their perfected character as conveyances. Where a delivery of a deed to a third person is insufficient in that the grantor has not effectually parted with the control over the instrument, it may be rendered effective by subsequent acts and declarations of the grantor showing his intent to part with such control, although the depository is not informed of the grantor's changed intention. Moore v. Trott, 162 Cal. 268 (122 Pac. 462). During her last illness, and while she was in the hospital in Atlanta, the grantor gave to her cousin, Mrs. Lucy Sandburg, these directions about the delivery of these deeds: " Lucy, I know the end is near. I want you to do something for me. You know I have deeded Bess my house and store in Flovilla. You understand why. These papers are with Mr. Gibson in the Bank of Flovilla. I want you to get them at once and deliver them to Bess." These directions amounted to an unequivocal, unconditional, and complete renunciation by the grantor of dominion over these instruments, and to a valid verbal delivery, i. e., one " by words and doing nothing," whereby the title to these premises passed to the grantee, although these deeds did not reach the hands of the grantee until after the death of the grantor. If nothing more appeared, we could hold, as a matter of law, that this was an effectual delivery of these deeds, and that a verdict for the defendant was demanded; but there is some evidence tending to show that the grantor, at the time she gave these directions, was mentally incapable of transacting business, and for this reason incapable of giving any valid directions in this matter. Furthermore, it was a question of fact for the jury to find whether the above instructions were given in the language employed. So questions of fact as to the mental capacity of the grantor and the exact character of the above instructions are raised, and these can only be solved by a jury. If the jury should find that these directions were given,

and that the grantor at the time was possessed of sufficient strength of mind to clearly understand the nature and effect of her act in giving these directions, then they should find in favor of the delivery of these deeds and for the defendant. Because of this issue of fact, we are unable to say that a verdict for the defendant was demanded, on the ground that the deeds had been actually delivered.

*Judgment reversed. All the Justices concur, except Gilbert, J., dissenting.*